# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| KYLE SUMMERS, Individually and for Others Similarly Situated | **Case No.** _____ |
| v. | Jury Trial Demanded |
| THE DOE RUN RESOURCES CORPORATION d/b/a THE DOE RUN COMPANY | FLSA Collective Action |

## ORIGINAL COLLECTIVE ACTION COMPLAINT

### SUMMARY

1.      Kyle Summers (Summers) brings this collective action to recover unpaid wages and other damages from The Doe Run Resources Corporation d/b/a The Doe Run Company (Doe Run).

2.      Doe Run employed Summers as one of its Hourly Employees (defined below).

3.      Doe Run pays Summers and the other Hourly Employees by the hour worked.

4.      Summers and the other Hourly Employees regularly work more than 40 hours a workweek.

5.      However, Doe Run does not pay Summers and the other Hourly Employees for all their hours worked, including overtime hours.

6.      Rather, Doe Run requires Summers and the other Hourly Employees to suit out in protective clothing and safety gear necessary to safely perform their job duties, while on Doe Run's premises "off the clock."

7.      Likewise, Doe Run requires Summers and the other Hourly Employees to change out of and store their safety gear and protective clothing and wash-up, while on Doe Run's premises "off the clock." (¶¶ 6-7 together, Doe Run's "pre/post shift off the clock policy").

8.      But Doe Run does not pay Summers and the other Hourly Employees for the time they spend donning and doffing their safety gear and protective clothing and washing-up, "off the clock," before and after their shifts.

9.      Doe Run's pre/post shift off the clock policy violates the Fair Labor Standards Act (FLSA) by failing to compensate Summers and the other Hourly Employees at 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 a workweek.

## JURISDICTION & VENUE

10.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a federal question under the FLSA. 29 U.S.C. § 216(b).

11.     This Court has general personal jurisdiction over Doe Run because it maintains its principal place of business in Missouri.

12.     Venue is proper because Doe Run maintains its principal place of business in St. Louis, Missouri, which is in this District and Division. 28 U.S.C. § 1391(b)(1).

## PARTIES

13.     Doe Run employed Summers as an entry level miner from approximately July 2023 to May 2024.

14.     Throughout his employment, Doe Run subjected Summers to its pre/post shift off the clock policy.

15.     Summers' written consent is attached as **Exhibit 1**.

16.     Summers brings this collective action on behalf of himself, and other Doe Run employees on whom Doe Run imposed its pre/post shift off the clock policy.

17.     The putative FLSA collective of similarly situated employees is defined as:

> **All hourly Doe Run employees who worked during the last three years through final resolution of this action (the "Hourly Employees").**

18.     Doe Run is a New York corporation headquartered in St. Louis, Missouri.

19.     Doe Run may be served with process through its registered agent: **C T Corporation System, 5661 Telegraph Rd., Ste. 4B Saint Louis, Missouri 63129.**

## FLSA COVERAGE

20.     At all relevant times, Doe Run was an "employer" within the meaning of the FLSA. 29 U.S.C. § 203(d).

21.     At all relevant times, Doe Run was an "enterprise" within the meaning of the FLSA. 29 U.S.C. § 203(r).

22.     At all relevant times, Doe Run was an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of the FLSA because it had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials—such as cell phones, tools, and personal protective equipment—that have been moved in or produced for commerce. 29 U.S.C. § 203(s)(1).

23.     At all relevant times, Doe Run had an annual gross volume of sales made or business done of not less than $1,000,000 each year.

24.     At all relevant times, Summers and the other Hourly Employees were Doe Run's "employees" within the meaning of the FLSA. 29 U.S.C. § 203(e).

25.     At all relevant times, Summers and the other Hourly Employees were engaged in commerce or in the production of goods for commerce.

## FACTS

26.     Doe Run operates multiple mines "in the Viburnum Trend[, which] contain[s] some of the world's purest lead."[1]

---

[1] https://doerun.com/what-we-do/mining-milling/ (last visited April 7, 2025).

- 3 -

27.    "On any given day, about 350 Doe Run employees are [working] underground" in these mines.[2]

28.    To meet its business objectives, Doe Run employs workers, including Summers and the other Hourly Employees, to extract and process lead, zinc, and copper.

29.    For example, Doe Run employed Summers from approximately July 2023 until May 2024 at its Brushy Creek Mine as an entry level miner.

30.    As an entry level miner, Summers's job duties included operating a loader, dumping materials, cleaning up work areas around the mine, scaling, loading haul trucks, and monitoring safety equipment in accordance with Doe Run's direction.

31.    Likewise, Summers's job duties included donning and doffing his safety gear and protective clothing and washing up on Doe Run's premises, before and after his shifts.

32.    Throughout his employment, Summers recorded his "on the clock" hours using Doe Run's timekeeping system.

33.    Thus, Doe Run's records reflect the number of "on the clock" hours Summers recorded working each week.

34.    Throughout his employment, Summers regularly worked more than 40 hours a workweek.

35.    Indeed, throughout his employment, Summers typically worked approximately 12 hours a day and 4 days a week (48 hours a workweek) "on the clock."

36.    Doe Run paid Summers approximately $22 an hour.

37.    But throughout his employment, Doe Run did not pay Summers for all his hours worked.

---

[2] *Id.*

38.     Instead, throughout his employment, Doe Run subjected Summers to its pre/post shift off the clock policy.

39.     Specifically, Doe Run required Summers to dress out in protective clothing and safety gear (including hard hat, head lamp, reflective vest, ear protection, steel toed boots, safety glasses, gloves, dust mask, fire retardant clothing, self-contained self-rescuer, tracker, and respirator) fundamentally necessary to performing his job, "off the clock," and without compensation.

40.     This took Summers approximately 15 to 20 minutes each workday.

41.     Summers could not perform his principal job duties in accordance with Doe Run's policies, procedures, and expectations without this protective clothing, safety gear, and other equipment.

42.     Indeed, much of the gear Summers utilized is mandated by federal regulation. *See* 29 C.F.R. § 1910.132; 30 C.F.R. § 56, *et seq*; 30 C.F.R. § 57, *et seq.*

43.     The donning of protective clothing and safety gear and other equipment were therefore integral and indispensable work duties for Summers.

44.     Likewise, Doe Run required Summers to remove and store his safety gear and protective clothing and wash up each day after his shift, "off the clock" and without compensation.

45.     This took Summers approximately 30 minutes each workday.

46.     Summers could not perform his job duties in accordance with Doe Run's policies, procedures, and expectations without removing and storing this safety gear and protective clothing and washing up each workday.

47.     Summers could not safely perform his job duties in accordance with Doe Run's policies, procedures, and expectations without removing and storing this safety gear and protective clothing and washing up each workday.

48.     The removal and storage of safety gear and protective clothing, as well as other equipment, and washing up each day were therefore integral and indispensable work duties for Summers.

49.     But under its pre/post shift off the clock policy, Doe Run did not compensate him for the same.

50.     Thus, because of its pre/post shift off the clock policy, Doe Run failed to pay Summers overtime wages for all his overtime hours worked during workweeks he worked in excess of 40 hours.

51.     Summers and the other Hourly Employees perform their jobs under Doe Run's supervision and use materials, equipment, and technology Doe Run approves and supplies.

52.     Doe Run requires Summers and the other Hourly Employees to follow and abide by common work, time, pay, and overtime policies and procedures in the performance of their jobs.

53.     Summers' and the other Hourly Employees' work must strictly adhere to the uniform standards put in place by Doe Run.

54.     At the end of each pay period, Summers and the other Hourly Employees receive wages from Doe Run that are determined by common systems and methods that Doe Run selects and controls.

55.     Likewise, the other Hourly Employees typically work approximately 12 hours a day and 4 days a week (48 hours a workweek) "on the clock."

56.     But, just as with Summers, Doe Run fails to pay them for all their hours worked.

57.     Indeed, Doe Run subjects the other Hourly Employees to the same or similar pre/post shift off the clock policy it imposed on Summers.

58.     Specifically, just as with Summers, Doe Run requires them to dress out in their protective clothing and safety gear (including hard hat, head lamp, reflective vest, ear protection, steel

toed boots, safety glasses, gloves, fire retardant clothing, dust mask, self-contained self-rescuer, tracker and respirator) and gather other equipment fundamentally necessary to performing their jobs, "off the clock," and without compensation.

59.     And, like Summers, Doe Run requires them to remove and store their safety gear and protective clothing, as well as other equipment, and wash up each day after their shifts, "off the clock" and without compensation.

60.     And like Summers, much of the gear they must utilize is mandated by federal regulation. *See* 29 C.F.R. § 1910.132; 30 C.F.R. § 56, *et seq*; 30 C.F.R. § 57, *et seq*.

61.     But, like Summers, the other Hourly Employees are regularly forced to perform this compensable work "off the clock" before and/or after their shifts.

62.     Thus, just as with Summers, Doe Run does not pay the other Hourly Employees for this integral and indispensable work they are required to perform "off the clock" before and after their shifts.

63.     And, just as with Summers, these job duties take the other Hourly Employees approximately 45 to 50 minutes to complete each workday.

64.     Doe Run fails to exercise its duty as the Hourly Employees' employer to ensure they are not performing work "off the clock" on its premises that Doe Run does not want performed.

65.     And Doe Run knows, should know, or recklessly disregards whether Summers and the other Hourly Employees routinely perform integral and indispensable work "off the clock," and without compensation, before and after their scheduled shifts for Doe Run's primary benefit.

66.     Thus, Doe Run requires, requests, suffers, or permits, Summers and the other Hourly Employees to work "off the clock," without compensation, before and after their shifts.

67.     Despite accepting the benefits, Doe Run does not pay Summers and the other Hourly Employees for the compensable work they perform "off the clock."

68.    Thus, under Doe Run's uniform pre/post shift off the clock policy, Summers and the other Hourly Employees are denied overtime wages for the compensable work they perform "off the clock" before and after their scheduled shifts during workweeks in which they work more than 40 hours.

69.    The Hourly Employees are thus uniformly subject to the same or similar unlawful policies—Doe Run's pre/post shift off the clock policy—for similar work, in willful violation of the FLSA.

### COLLECTIVE ACTION ALLEGATIONS

70.    Summers brings his claims as a collective action under Section 216(b) of the FLSA on behalf of himself and the other Hourly Employees.

71.    Like Summers, the other Hourly Employees are victimized by Doe Run's pre/post shift off the clock policy.

72.    Other Hourly Employees worked with Summers and indicated they were paid in the same manner, performed similar work, and were subject to Doe Run's same pre/post shift off the clock policy.

73.    Based on his experience with Doe Run, Summers is aware Doe Run's pre/post shift off the clock policy was imposed on other Hourly Employees.

74.    The Hourly Employees are similarly situated in the most relevant respects.

75.    Even if their precise job duties and locations might vary, these differences do not matter for the purpose of determining their entitlement to overtime wages at the required premium rate for all overtime hours worked.

76.    Therefore, the specific job titles or job locations of the Hourly Employees do not prevent collective treatment.

- 8 -

77.     Rather, Doe Run's pre/post shift off the clock policy renders Summers and the other Hourly Employees similarly situated for the purpose of determining their right to overtime wages for all overtime hours worked.

78.     Doe Run's records reflect the number of "on the clock" hours it recorded the Hourly Employees working each week.

79.     The back wages owed to Summers and the other Hourly Employees can therefore be calculated using the same formula applied to the same records.

80.     Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to Doe Run's records, and there is no detraction from the common nucleus of liability facts.

81.     Therefore, the issue of damages does not preclude collective treatment.

82.     Summers' experiences are therefore typical of the experiences of the other Hourly Employees.

83.     Summers has no interest contrary to, or in conflict with, the other Hourly Employees that would prevent collective treatment.

84.     Like each Hourly Employee, Summers has an interest in obtaining the unpaid wages owed under federal law.

85.     Summers and his counsel will fairly and adequately protect the interests of the Hourly Employees.

86.     Summers retained counsel with significant experience in handling complex collective action litigation.

87.     Absent this collective action, many Hourly Employees will not obtain redress for their injuries, and Doe Run will reap the unjust benefits of violating the FLSA.

88. Further, even if some of the Hourly Employees could afford individual litigation, it would be unduly burdensome to the judicial system.

89. Indeed, the multiplicity of actions would create hardship for the Hourly Employees, the Court, and Doe Run.

90. Conversely, concentrating the litigation in one forum will promote judicial economy and consistency, as well as parity among the Hourly Employees' claims.

91. The questions of law and fact that are common to each Hourly Employee predominate over any questions affecting solely the individual members.

92. Among the common questions of law and fact are:

    a. Whether Doe Run imposed its pre/post shift off the clock policy on the Hourly Employees;

    b. Whether Doe Run's pre/post shift off the clock policy deprived the Hourly Employees of overtime compensation for overtime hours worked;

    c. Whether Doe Run failed to pay the Hourly Employees overtime wages at the required premium rates—based on all remuneration—for all overtime hours worked;

    d. Whether Doe Run's decision not to pay the Hourly Employees overtime wages at the required rates—based on all remuneration—for all overtime hours worked was made in good faith; and

    e. Whether Doe Run's violations were willful.

93. As part of its regular business practices, Doe Run intentionally, willfully, and repeatedly violated the FLSA with respect to Summers and the other Hourly Employees.

94. Doe Run's pre/post shift off the clock policy deprived Summers and the other Hourly Employees of the overtime wages at the required premium rate for overtime hours worked, in willful violation of the FLSA.

- 10 -

95.    There are many similarly situated Hourly Employees who have been denied overtime wages who would benefit from the issuance of a court supervised notice of this lawsuit and the opportunity to join it.

96.    The Hourly Employees are known to Doe Run, are readily identifiable, and can be located through Doe Run's business and personnel records.

## DOE RUN'S VIOLATIONS WERE WILLFUL

97.    Doe Run knew it employed the Hourly Employees.

98.    Doe Run knew it was subject to the FLSA's overtime provisions.

99.    Doe Run knew Summers and the other Hourly Employees were its non-exempt employees entitled to overtime pay.

100.    Doe Run knew the FLSA required it to pay non-exempt employees, including Summers and the other Hourly Employees, overtime wages at rates not less than 1.5 times their regular rates of pay for all hours worked after 40 a workweek.

101.    Doe Run knew Summers and each Hourly Employee worked more than 40 hours in at least one workweek during the last 3 years because their "on the clock" hours were recorded via its timekeeping system.

102.    Doe Run knew it paid the Hourly Employees according to its pre/post shift off the clock policy.

103.    Doe Run knew it had a duty to ensure the Hourly Employees were not performing work "off the clock" (without pay).

104.    Doe Run knew it required the Hourly Employees to don and doff safety gear and protective clothing and wash-up, "off the clock."

105.    Doe Run knew it controlled the Hourly Employees' work procedures.

106. Doe Run knew the Hourly Employees' mandatory "off the clock" work was a fundamental requirement of their jobs with Doe Run.

107. Doe Run knew the Hourly Employees' mandatory "off the clock" work was an integral and indispensable requirement to their principal job duties with Doe Run.

108. Doe Run knew the Hourly Employees routinely performed this daily, required "off the clock" work for Doe Run's predominant benefit.

109. In other words, Doe Run knew the Hourly Employees performed compensable work (*e.g.*, donning/doffing their safety gear and protective clothing, gathering tools and equipment, and washing-up) "off the clock" and without compensation.

110. And Doe Run knew the FLSA required it to pay Summers and the other Hourly Employees at least 1.5 times their regular rates of pay for all hours worked in excess of 40 a workweek.

111. Doe Run knew Summers, and the other Hourly Employees regularly worked in excess of 40 hours a workweek.

112. Thus, Doe Run knew, should have known, or recklessly disregarded whether it failed to pay Summers and the other Hourly Employees at least 1.5 times their regular rates of pay for all the hours they worked in excess of 40 a workweek.

113. Doe Run's failure to pay Summers and the other Hourly Employees overtime at the required rates for all overtime hours worked was neither reasonable, nor was this decision made in good faith.

114. Doe Run knowingly, willfully, and/or in reckless disregard of the FLSA carried out its unlawful bonus pay scheme and pre/post shift off the clock policy that deprived Summers and the other Hourly Employees of overtime wages at the required rate of pay for all hours worked after 40 a workweek, in violation of the FLSA.

- 12 -

115.    Indeed, Doe Run has previously been sued for failing to pay wages in compliance with the FLSA. *See e.g., Bowman, et al. v. The Does Run Resources Corporation d/b/a The Doe Run Company, et al.,* No. 4:13-cv-02519-CDP (E.D. Mo.).

### CAUSE OF ACTION
### FAILURE TO PAY OVERTIME UNDER THE FLSA
### (FLSA COLLECTIVE)

116.    Summers brings his FLSA claim as a collective action on behalf of himself and the other Hourly Employees pursuant to 29 U.S.C. § 216(b).

117.    Doe Run violated, and is violating, the FLSA by employing non-exempt employees, such as Summers and the other Hourly Employees, in a covered enterprise for workweeks longer than 40 hours without paying such employees overtime wages at rates not less than 1.5 times their regular rates of pay for the hours they worked in excess of 40 a workweek, including hours worked off the clock.

118.    Doe Run's unlawful conduct harmed Summers and the other Hourly Employees by depriving them of the overtime wages they are owed.

119.    Accordingly, Doe Run owes Summers and the other Hourly Employees the difference between the wages actually paid and the overtime wages actually earned.

120.    Because Doe Run knew or showed reckless disregard for whether its pre/post shift off the clock policy violated the FLSA, Doe Run owes Summers and the other Hourly Employees these wages for at least the past 3 years.

121.    Doe Run is also liable to Summers and the other Hourly Employees for an amount equal to all their unpaid overtime wages as liquidated damages.

122.    Finally, Summers and the other Hourly Employees are entitled to recover all reasonable attorneys' fees and costs incurred in this action.

- 13 -

**JURY DEMAND**

123.    Summers demands a trial by jury on all Counts.

**RELIEF SOUGHT**

WHEREFORE, Summers, individually and on behalf of the other Hourly Employees, seeks the following relief:

a.    An Order designating this lawsuit as a collective action and authorizing notice to the Hourly Employees allowing them to join this action by filing a written notice of consent;

b.    An Order finding Doe Run liable to Summers and the other Hourly Employees for unpaid overtime wages owed under the FLSA, plus liquidated damages in an amount equal to their unpaid wages;

c.    Judgment awarding Summers and the other Hourly Employees all unpaid wages, liquidated damages, statutory damages, and any other penalties available under the FLSA;

d.    An Order awarding attorneys' fees, costs, and expenses;

e.    An Order awarding pre- and post-judgement interest at the highest applicable rates; and

f.    Such other and further relief as may be necessary and appropriate.

Dated: April 24, 2025

Respectfully submitted,

**ENGELMEYER & PEZZANI, LLC**

By: */s/ Anthony M. Pezzani*
Anthony M. Pezzani
MOED Bar No. 52900MO
13321 N. Outer Forty Road, Suite 300
Chesterfield, MO 63017
(636) 532-9933 Phone
(314) 448-4320 Facsimile

Michael A. Josephson*
TX Bar No. 24014780
Andrew W. Dunlap*
TX Bar No. 24078444
**JOSEPHSON DUNLAP, LLP**
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
Phone: (713) 352-1100
Fax:     (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com

Richard J. (Rex) Burch
MOED Bar No. 24001807TX
**BRUCKNER BURCH, PLLC**
11 Greenway Plaza, Suite 3025
Houston, Texas 77046
Phone: (713) 877-8788
Fax:     (713) 877-8065
rburch@brucknerburch.com

*Pro hac vice applications forthcoming*

**ATTORNEYS FOR SUMMERS &
THE HOURLY EMPLOYEES**